IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Estate of Cau Bich Tran, et al., | NO. C 03-04997 JW |
| Plaintiff(s), | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| City of San Jose, et al., | |
| Defendant(s). | |

## I. INTRODUCTION

This is a tragic case. On July 13, 2003, two San Jose Police Officers went to the home of Ms. Cau Bich Tran in response to a neighbor's concern for the safety of her children. Shortly after they entered her home, they found Ms. Tran in her kitchen holding a kitchen implement, which appeared to one of the police officers to be a meat cleaver. Ms. Tran had been using the implement to try to open a bedroom door, which she had accidentally locked. One of the police officers states that he believed that she was using the implement to threaten the officers or members of her family and in front of her family, he fatally shot her Ms. Tran.

Ms. Tran's Estate, her two children and her parents filed this action against the City of San Jose ("City"), Police Officer Chad Marshall ("Officer Marshall"), William Lansdowne ("Lansdowne"), Thomas Wheatley ("Wheatley"), and Robert L. Davis ("Davis") (collectively "Defendants"). Plaintiffs allege that Defendants violated their constitutional rights pursuant to 42 U.S.C. section 1983. Before the Court is a motion by Defendants for summary judgment or in the alternative for partial summary judgment on the ground that, based on the evidence, the use of deadly force was justified.

## II. STATEMENT OF UNDISPUTED FACTS

The shooting took place on July 13, 2003. At around 8:08 p.m., Ms. Tran telephoned 911 because she had locked herself out of her bedroom in her apartment on East Taylor Street in San Jose. Ms. Tran lived in the apartment with Dang Bui and their two children. Ms. Tran and Mr. Bui are Vietnamese immigrants. Ms. Tran's difficulty with English is evident from the transcript of the call to 911. The dispatcher explained that unless a child was locked in the bedroom, no emergency service assistance would be dispatched. However, it became immediately clear to the dispatcher that Ms. Tran was not understanding what the dispatcher was attempting to communicate to her. The dispatcher put a Vietnamese speaking operator on the call. The interpreter explained to Ms. Tran that unless children were locked inside of the room, neither the police nor the fire department would come to Ms. Tran's assistance. The interpreter advised Ms. Tran that she should try to break down the door herself or call a locksmith. It is not clear from the transcript whether or not she understood that the police would not be coming to assist her. The call ended around 8:13 p.m.

Upset both by Mr. Bui's teasing of her being an "old lady" and by the 911 response, she took a knife out of the kitchen drawer, walked outside and around the apartment window and attempted to open the window to the bedroom by prying it with the knife. Mr. Bui followed her but she told him that she did not need his help. He went back into the apartment. When he heard the sound of glass breaking, he walked outside. Ms. Tran was walking back to the front. She was no longer holding the knife. Shortly after, Ms. Tran decided to go down the street to the home of neighbors for help.

On that same July 13 evening, Ms. Joy Tamez, was visiting her friend Ms. Delores Salazar, who lived across the street from Ms. Tran's apartment. As Ms. Tamez got out of her car, she encountered Ms. Tran. Ms. Tamez described the woman as an Asian woman walking down the street screaming and yelling. After Ms. Tran passed by her, Ms. Tamez saw a small Asian child in the street calling for his mother. Ms. Tamez took the child out of the street just as a truck passed near the child. Ms. Tamez yelled to Ms. Salazar to call the police, which she did. The 911 dispatcher dispatched Officers Chad Marshall and Tom Mun to the scene.

2

Ms. Tamez then saw Mr. Bui crossed the street. Ms. Tamez gave the child to Mr. Bui. Mr. Bui then got into his car with the children to begin looking for Ms. Tran. By this time, Ms. Tran had walked to 12th Street. She knocked on the door of Mr. Jorge Esparza's house. According to Mr. Esparza, Ms. Tran was trying to tell him something about a key. Mr. Esparza decided to assist her and accompanied her back to her apartment. On their way back, they saw Mr. Bui driving in his car. Mr. Esparza testified that Ms. Tran began yelling at Mr. Bui in a foreign language. Eventually, Ms. Tran, Mr. Bui and the two children all returned to their Taylor Street apartment. Ms. Tamez saw the family return to the apartment. From across the street, Ms. Tamez could hear continued screams from the Asian woman. She saw someone close the blinds to the apartment. Ms. Tamez could also hear children crying. She was concerned for the well-being of the children.

Meanwhile, Ms. Salazar was on the telephone to the 911 dispatcher. Ms. Salazar relayed what Ms. Tamez was telling her with respect to the activities at the apartment and their suspicion of domestic violence. This additional information was passed on the Officers Marshall and Mun, along with the address of the apartment.

As she hung up the telephone from calling 911, Ms. Salazar went outside and saw the police entering the Taylor Street apartment.

According to Mr. Bui, when they got back to the apartment, Ms. Tran went into the kitchen and sat down. She then took the dao bao (a Vietnamese vegetable peeler) out of the kitchen knife drawer. Ms. Tran tried to pry the bedroom door open with the implement without any success. She returned to the kitchen, sat down in a chair at the kitchen table and cried loudly. Ms. Tran was still holding the dao bao in her hand. Apparently, her failure to get the door open and the unwillingness of the police to come caused Ms. Tran to become even more upset, crying more loudly.

Mr. Bui decided to give the children a bath. As he went about making preparations for the children's bath, he heard loud knocking on the door. The knock was by Officer Marshall.

At approximately 9:00 p.m. Officers Marshall and Mun approached the Taylor Street residence. They heard loud screaming from within the apartment. Officer Marshall knocked on the door while Officer Mun went on the radio to ask for radio silence.

3

1    Mr. Bui opened the door and a police officer forcefully pushed the door open. Officer Marshall
2 entered first, followed by Officer Mun. Officer Marshall asked Mr. Bui, "What happened?" Mr. Bui said
3 something about Ms. Tran's problem with the door and proceeded to go back to the bathroom to continue
4 his preparations for the children's baths. According to Mr. Bui, when he opened the door, Ms. Tran
5 stood up–in the Vietnamese culture, it is a custom to stand up and greet guests in your home.

6    Still crying, but apparently believing that the police officer had come in response to her telephone
7 call, Ms. Tran pointed toward the locked bedroom door with her left hand, still holding the peeler. Officer
8 Marshall testified that he began moving closer to where Mr. Bui and the children where standing, which was
9 in front of the entrance between the bedroom and the living room. Mr. Bui noticed that the officer's arm
10 was extended like he was pointing. Within a matter of seconds, Mr. Bui heard Officer Marshall say, "Hey,
11 hey," followed by a gun shot. Mr. Bui turned to see Ms. Tran fall to the floor. Mr. Bui could not recall
12 whether he also heard a police officer say, "Stop." The entire episode took only a matter of three to four
13 seconds.

14    Immediately, Officer Marshall said to Mr. Bui, "Did you see a knife?" Mr. Bui responded, "Yeah.
15 Yeah." The officer pushed Mr. Bui into the bathroom with the children.

16    Officer Marshall disputes Mr. Bui's version of the events. Officer Marshall testifies that as he was
17 about to enter the apartment, from outside of the apartment he heard a person, rummaging through a
18 kitchen drawer. Officer Marshall testifies that he believed that the person was rummaging through the
19 drawer looking for something. (Opp'n at 6). The Court presumes that this testimony is offered by
20 Defendants as circumstantial evidence that the officer reasonably believed that Ms. Tran was quickly going
21 through a kitchen drawer to find a weapon to use against the officers.

22    Officer Mun who entered along with Officer Marshall and was standing close to a kitchen window,
23 testifies that does not recall hearing the sound of a person rummaging around in a kitchen drawer. Id.

24    Officer Marshall testifies that immediately after he entered the apartment, Ms. Tran screamed at him
25 and raised what appeared to be a "cleaver". (Motion at 6.) According to Officer Marshall, Ms. Tran then
26 advanced from behind the counter, holding the cleaver at shoulder height, moving her right hand back and
27 forth. Id. Officer Marshall testifies that despite his issuing two warnings of "drop the knife," Ms. Tran

28

4

continued to scream and moved her arm in a manner indicating she was about to throw the implement toward the officers (or toward the other family members). (Motion at 7-8.) He states that he drew his weapon and shot her in self-defense and in defense of others.

Plaintiffs do not dispute that the evidence shows, that when the police officers entered the apartment Ms. Tran was in her kitchen holding something in her left hand. Plaintiffs contend that the evidence will show that the implement Ms. Tran was holding was a "dao bao," a Vietnamese vegetable peeler. Plaintiffs contend that the evidence shows that Ms. Tran had had the dao bao in her hand for several minutes prior to the arrival of the officers.

Plaintiffs contend that the evidence shows that the police entered the apartment with Mr. Bui's permission. They contend that Mr. Bui did nothing to indicate that he felt threatened by Ms. Tran. Plaintiffs acknowledge that the police officers found Ms. Tran in her kitchen admittedly upset. Plaintiffs contend that when Ms. Tran became aware of the presence of the police officers, she gestured toward the front door with the hand holding the implement. Mr. Bui testified at the Grand Jury that Ms. Tran's gesture was pointing towards the door. Plaintiffs contend that the evidence will show that Officer Marshall issued no verbal warning or command to Ms. Tran. Instead, seconds after entering the apartment, according to the Plaintiffs, Officer Marshall said, "hey hey," drew his weapon and shot Ms. Tran. (Motion at 8, Opp'n at 8.)

### III. DISCUSSION

Defendants move for summary judgment or partial summary judgment on the Section 1983 claims on the ground that Officer Marshall did not use excessive force, but that, even if he did, he is entitled to qualified immunity. Defendants further contend that because Officer Marshall is entitled to qualified immunity, the City and its police Chiefs are entitled to judgment as a matter of law. A hearing was held on June 29, 2005 and the matter submitted for decision.

**A.    Summary Judgment**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The

purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323.  If the moving party meets this burden, the moving party is then entitled to judgment as a matter of law when the responding fails to make a sufficient showing on an essential element of the responding party's case with respect to which the responder bears the burden of proof at trial. Id. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial. " Fed. R. Civ. P. 56(e).  The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties.  To preclude the entry of summary judgment, the non-moving party must bring forth evidence that show there is a dispute about material facts,  i.e., "facts that might affect the outcome of the suit under the governing law  . . .   Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255); Matsushita, 475 U.S. at 588; T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 630 (9th Cir. 1987).  It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." T.W. Elec. Serv., 809 F.2d at 631.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  However, "[w]here the record taken as a

6

whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587.

**B.     Elements of Section 1983 Claim**

In order to prove a violation of Section 1983, Plaintiffs must prove that Defendants deprived them of a federal constitutional right while acting under color of law.  It is undisputed that Officer Marshall was acting under color of law.  The only issue insofar as Section 1983 liability is concerned, is whether Ms. Tran was deprived of a federal constitutional right.

**C.     Cau Bich Tran's Fourth Amendment Claim**

The Fourth Amendment protects persons against "unreasonable searches and seizures."  U.S. Const. Amend. IV.  Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances.  See Graham v. Connor, 490 U.S. 386, 397 (1989); Saucier v. Katz, 533 U.S. 194 (2001).  In this case, the parties do not dispute that a seizure occurred.  The question is whether by shooting Cau Bich Tran, Officer Marshall acted reasonably.

In deciding whether reasonable force was used, the Court must balance the force which was used against the need for it.  Tennessee v. Garner, 471 U.S. 1, 3 (1985).  In making that balancing decision, the Court must assess the relevant facts from the perspective of a reasonable officer on the scene.  Graham, 490 U.S. at 397.

Officer Marshall shot Ms. Tran center mass from a distance of approximately 7 to 8 feet.  This was the application of deadly force because it created a substantial risk of death or serious injury to Ms. Tran.  The question becomes whether the circumstances justified the use of deadly force?

Deadly force may be used against an individual if an officer has probable cause to believe that the individual's actions place the police officer or others in imminent danger of death or serious bodily harm.  This standard is an objective standard, meaning, the Court must decide if the officer's belief (that the individual against whom the officer is using deadly force places the officer or others in imminent danger of death or serious bodily harm) was "objectively reasonable" in light of the facts and circumstances confronting the officer.  Graham, 490 U.S. at 397.

7

1    In this case, taking the facts is the light most favorable to the Plaintiffs, a reasonable jury could

2 conclude that Officer Marshall's belief that he needed to shoot Ms. Tran was unreasonable. According to

3 Plaintiffs' version of the events, Ms. Tran was upset, perhaps even disproportionately so because she was

4 locked out of her bedroom since around 5:00 p.m. She had called the police for help. She had been

5 advised by police authorities to try to break down the door herself. When the police arrived, her boyfriend

6 told them she was upset about the door. As she stood up, she had an implement in her hand. However, it

7 was not a weapon which she was using to threaten the family or the police. It was the implement which she

8 had used to try to open the locked bedroom door. Her movement and gestures were consistent with

9 frustration and emotional upset.

10    Based on Plaintiffs' evidence, a reasonable fact finder could conclude that Officer Marshall's belief

11 that Ms. Tran was about to throw the implement at him or other people in the room was unreasonable, and

12 that therefore, Officer Marshall was not justified in using deadly force.

13    Moreover, there is a dispute about what Ms. Tran and the police officers did before the fatal shot

14 was fired. Did she arm herself with the implement immediately before the police entered the apartment?

15 Did she motion with her hand toward the locked door or toward the police? Did she advance on the police

16 after being told to stop? Did she raise the implement above her head? Was she told to drop the

17 implement? Was her boyfriend shielding the children from Ms. Tran or from the police? Did Mr. Bui tell

18 the police that Ms. Tran suffered from a mental illness? These and other factual questions bear directly on

19 the reasonableness of Officer Marshall's belief that he or others were in imminent danger.

20    Defendants contend that the factual disputes raised by Plaintiffs such as Officer Mun's statement

21 that he "does not recall seeing a drawer open in the kitchen, or seeing or hearing the woman going through

22 a drawer," are either immaterial or are not actually disputes at all. (Motion at 12.) However, the Court

23 finds that these disputes are material to whether Officer Marshall's actions were objectively reasonable.

24 On a motion for summary judgment, the Court cannot decide whose version of the events is more credible.

25 Therefore, summary judgment on the merits of Plaintiffs' Fourth Amendment claim is DENIED.

26  **D.    Qualified Immunity**

27    Defendants contend that even if Officer Marshall violated Ms. Tran's Fourth Amendment rights,

28

8

1 summary judgment must be granted on the basis of qualified immunity.  Under the doctrine of qualified
2 immunity: "Government officials performing discretionary functions, generally are shielded from liability for
3 civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of
4 which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

5 　　　　In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court explained how to address the
6 qualified immunity issue on a summary judgment motion in an excessive force case.  The initial inquiry is
7 whether, taking the facts in the light most favorable to the party asserting the injury, the facts show that the
8 officer's conduct violated a constitutional right.  If the evidence cannot establish the violation of a
9 Constitutional right, the officer is not liable. Id. at 201.  In this case, the Court has already determined that,
10 taking the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that by using
11 deadly force, Officer Marshall violated Ms. Trans's rights under the Fourth amendment.

12 　　　　The second essential step is to ask whether the right was clearly established at the time of the
13 alleged violation.  The relevant dispositive inquiry, in determining whether the rights are clearly established,
14 is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation. Id. at
15 202.

16 　　　　The Plaintiffs bear the burden of establishing the existence of a clearly established constitutional
17 right.  A right is clearly established when its contours are "sufficiently clear that a reasonable official would
18 understand that what he is doing violates that right. Jacobs v. City of Chicago, 215 F.3d 758, 767 (7th
19 Cir. 2000) .  It is not necessary that the very action being challenged has been previously held
20 unconstitutional, so long as the unlawfulness was apparent in light of existing law. Anderson v. Creighton,
21 483 U.S. 635, 640 (1987).  "The qualified immunity standard gives ample room for mistaken judgment by
22 protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502
23 U.S. 224, 229 (1991).  "This accommodation for reasonable error exists because officials should not err
24 always on the side of caution for fear of being sued." Id.

25 　　　　It was clearly established at the time of this shooting, that the use of excessive force during a Fourth
26 Amendment seizure constituted a Fourth Amendment violation, and that the use of deadly force was
27 permissible only when the officer reasonably believed that an individual posed an immediate threat to the

28

9

officer or others. If Plaintiffs prove their version of the events, Officer Marshall is not entitled to qualified immunity because he employed deadly force on a woman who threatened no one. A reasonable police officer would have known that it was unreasonable to use deadly force against a person who did not pose a threat of death or serious bodily harm.

On the other hand, if the facts prove to be as Defendants have described them, the result could be different. A reasonable police officer does not violate a clearly established right if an individual who angrily advances toward a police officer with what appears to be a cleaver above her head after being told to stop or to drop the weapon.

Although Saucier did reject the practice of denying summary judgment whenever a material issue of fact remains to be resolved, the existence of disputed facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue. See Wilkins v. City of Oakland, 250 F.3d 949, 955-56 (9th Cir. 2003). In Wilkins, the Ninth Circuit held that "[w]here the officer's entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriated." Id. at 956. The entitlement of a police officer to qualified immunity for using deadly force is different if the jury believes that the officer shot Ms. Tran as she advanced on him after a warning and a command, than would be his entitlement if the jury believes that he shot her without warning upon seeing her in a kitchen with a kitchen implement in her hand. Thus, dismissal of all related claims arising out of the alleged Fourth Amendment violation of Ms. Tran's are DENIED. The Court invites Defendants to renew their motion upon development of a full factual record.

**E.      Plaintiffs' Due Process Claim**

Plaintiffs' Second Cause of Action alleges a violation of Section 1983 on behalf of themselves under the Due Process Clause of the Fourteenth Amendment. Individual plaintiffs may allege Section 1983 liability to vindicate their own constitutional rights to liberty arising out of their relationship with the deceased. See Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365, 371 (9th Cir. 1998). Such claims are considered substantive due process claims and are subject to the "deliberate indifference," "shock the conscience," or "reckless disregard" standard. See Byrd v. Guess, 137 F.3d 1126, 1133-1134 (9th Cir. 1998); Moreland, supra, at 371-373. Most importantly, Moreland clearly states that "in such

1  circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the
2  element of arbitrary conduct shocking the conscience, necessary for a due process violation." Id. at 372.

3  Plaintiffs contend that a jury reasonably could conclude that Officer Marshall's intentional use of
4  deadly force, which occurred without a warning and was directed against Ms. Tran who was holding a
5  vegetable peeler and was not advancing toward him was egregious and outrageous that may fairly be said
6  to have shocked the conscience. (Opp'n at 32) (citing County of Sacramento v. Lewis, 523 U.S. 833 at
7  847, n. 8 (1998)). Though Moreland does not stand for the proposition that all deaths resulting from
8  conduct in the line of duty are immune from due process violation, it does require that the shooting officer
9  acted with some other purpose other than for law enforcement. There is no evidence that Officer Marshall
10 acted for some purpose other than law enforcement. Therefore, the motion for summary judgment on the
11 Second Cause of Action is GRANTED.

### F.  Plaintiffs' Monell Claim

Plaintiffs' Third Claim alleges that the City of San Jose and its current and former Police Chiefs, in their official capacity, are liable for maintaining unconstitutional policies and practices, and for adopting and ratifying the misconduct of Officer Marshall. Defendants' motion is based on the argument that, as a matter of law, there is no constitutional violation by Officer Marshall. Alternatively, Defendants contend that even if the Court does not rule in favor of Officer Marshall, the City and Chiefs are entitled to judgment because Plaintiffs will be unable to support such allegation with any actual facts. (Motion at 33.) Since the Court has found that there is a dispute as to whether Ms. Tran Fourth Amendment rights were violated, the issue with respect to Plaintiffs' Monell's claims is whether they should be applied to the City as well as the current and former Chiefs.

When the execution of a government's policy or custom results in the injury to an individual, that government, as an entity, is liable for the injury under § 1983. See Monell v. Dep't. of Soc. Services of the City of New York, 436 U.S. 658, 694 (1978). Liability under Monell is limited to "acts that are, properly speaking, acts of the municipality--that is, acts which the municipality has officially sanctioned or ordered." Penbaur v. City of Cincinnati, 475 U.S. 469 (1986). Defendants rightfully argues that a ratification of a

11

subordinate's unconstitutional conduct is one way of establishing under <u>Monell</u>. <u>Gillette v. Delmore</u>, 979 F.2d 1342, 13461347 (9th Cir. 1992); <u>Kanae v. Hudson</u>, 294 F.Supp.2d 1179 (D. Hawaii 2003).

Under 42 U.S.C. § 1983, an official capacity suit represents "only another way of pleading an action against an entity of which an officer is an agent." <u>Monell</u>, 436 U.S. 658 at 690 n. 55. Any official capacity claims against the current Chief and the former Chiefs are really claims against the government entity--the City of San Jose. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991). Thus, for purposes of summary judgment, the official capacity claims against the current Chief and the former Chiefs are redundant because the City is also a defendant. Therefore, those official capacity claims against all the Chiefs are DISMISSED as duplicative.

With respect to the City, Plaintiffs' proffer evidence, which if believed could satisfy the <u>Monell</u> standard. Without attempting to list every basis of <u>Monell</u> liability, it is sufficient to point to evidence of training by the San Jose Police Department that an edged weapon is as dangerous as a shotgun in all circumstances. (Opp'n at 33, Affidavit of W. Ken Katsaris ¶ 4.). This raises a genuine issue of material fact sufficient to deny the City's motion for summary judgment. Therefore, Defendants' motion for summary judgment on Plaintiffs' <u>Monell</u> claim is DENIED. The Court invites Defendants to renew their motion upon development of a full factual record.

**G.     Dismissal of the Individual Capacity Claims Against Current and Former Chiefs**

Defendants contend that the Court should grant summary judgment on Plaintiffs' Fourth Cause of Action seeking relief under section 1983 against current and former Chiefs of Police in their individual capacities. The sole argument for dismissal of this claim is that Defendants do not believe that such a claim exists, apart of a claim in their official capacity. The Ninth Circuit has held that "Supervisory liability is imposed against a supervisory official in his individual capacity for his 'own culpable action or inaction in the training, supervision, or control of his subordinates," [or] for his "'acquiescence in the constitutional deprivations of which the complaint is made.'" <u>Larez v. City of Los Angeles</u>, 946 F.2d 630, 646 (9th Cir. 1991).

Plaintiffs allege that by signing and accepting the Internal Affairs Report, Chief Davis acquiesced in Officer Marshall's conduct and the department's practices and policies and failure to properly train police

officers resulting in the shooting and death of Ms. Tran. (Opp'n at 34.) As to Chief Landsdowne, Plaintiffs contend that while he took direct responsibility in investigating the officer involved shooting, he failed to agree that Officer Marshall was a subject of a criminal investigation. Plaintiffs contend that by doing so, Chief Landsdowne acquiesced in the constitutional deprivations of which the complaint is made. Aside from citing Larez and the allegations above, Plaintiffs have produced no evidence of action or inaction by the current Chief and former Chiefs which caused injury to the Plaintiffs.

These allegations are insufficient to hold the Chiefs individually liable for Ms. Tran's death. To find such liability, Plaintiffs must prove that the officials "adopted a plan or policy authorizing or approve the alleged unconstitutional conduct." Heller v. Bushey, 759 F.2d 1371, 1375 (9th Cir. 1985). The Court finds that signing off on an internal affair report, or making comments after the shooting pursuant to internal departmental reviews do not meet the standard set out by Heller to hold the Chiefs individually liable. Accordingly, the individually claims against all the Chiefs are DISMISSED.

## IV.  CONCLUSION

For the foregoing reasons, this Court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment.

Dated: September 30, 2005   /s/ James Ware
JAMES WARE
United States District Judge

13

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Andrew C. Schwartz schwartz&#064;cmslaw.com
Clifford S. Greenberg cao.main@ci.sj.ca.us
Felicita Vu Ngo felicita_vu_ngo@yahoo.com
Karen L. Snell ksnell@clarencedyer.com
Michael R. Groves CAO.Main@ci.sj.ca.us

**Dated: September 30, 2005**　　　　　　　　　　　**Richard W. Wieking, Clerk**

　　　　　　　　　　　　　　　　　　　　　　　　　**By:  /s/ JW Chambers**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Ronald L. Davis**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Courtroom Deputy**